# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 19 2016, 7:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Schrontz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| E.F.,<br>*Appellant-Defendant,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Plaintiff.* | October 19, 2016<br><br>Court of Appeals Case No.<br>79A02-1602-JT-444<br><br>Appeal from the Tippecanoe County Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Trial Court Cause No.<br>79D03-1508-JT-67 |

**Altice, Judge.**

## Case Summary

[1] E.F. (Mother) appeals the involuntary termination of her parental rights (TPR) to K.S.F. (Child). Mother challenges the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts & Procedural History

[3] Mother began using opiates when she was twenty years old and heroin when she was twenty-one. On March 9, 2014, Mother, then twenty-two years old, gave birth to Child. The Tippecanoe County Department of Child Services (DCS) became involved with Mother that same day upon receiving a report of neglect from the hospital.

[4] On April 7, 2014, DCS filed a child in need of services (CHINS) petition alleging that Child was born with opiates in her system.[1] Further investigation revealed that Mother reported to nursing staff that she was unaware that she was pregnant, that she received no prenatal care, that she admitted to using heroin two to three times a week during the eight months preceding Child's birth, and that she most recently used heroin two days prior to Child's birth. Indeed, Child's meconium tested positive for opiates. At one day old, Child began displaying signs of heroin withdrawal, including seizures, tremors, lack of sleep, sneezing, and scratching at herself, for which Child had to be treated

---

[1] *See* Ind. Code § 31-34-1-10(1) ("a child is a child in need of services if . . . the child is born with . . . any amount, including a trace amount, of a controlled substance or a legend drug in the child's body").

with morphine.  Although Mother identified who she thought was Child's father, DNA testing revealed that another individual, D.H., was actually Child's biological father.[2]

[5]   At an initial hearing, the court authorized the continued removal of Child from Mother's care.  Child remained hospitalized for two months following her birth.  Upon her release, Child was placed in foster care, where she remained throughout these proceedings.

[6]   At a May 5, 2014 fact-finding hearing, Mother admitted to the allegations and factual circumstances set forth in the CHINS petition and the court adjudicated Child a CHINS.  The court held a dispositional hearing on June 4, 2014, and thereafter entered its dispositional decree ordering Mother to participate in services.

[7]   The eighteen months between Child's birth and the termination hearing can be divided into three distinct, six-month periods.  During the first six months after Child was born, Mother's participation in services was sporadic.  She was ultimately discharged for failure to participate.  Further, Mother twice admitted herself into the Salvation Army Harbor Lights (Harbor Lights) rehabilitation facility, but she failed to complete the initial stages of the program and each time she returned to using heroin.  She also failed to maintain regular visits with

---

[2] D.H. also had his parental rights terminated, but he does not participate in this appeal.  We will confine the facts and our discussion to that which is relevant to Mother.

Child. In fact, Mother would disappear for short periods as she continued to struggle with her heroin addiction. During this time, Mother tested positive for opiates on at least twenty-eight occasions.

[8] In October 2014, the beginning of the second six-month period, Mother entered the Harbor Lights rehabilitation facility for a third time. This time Mother successfully completed the detox and residential programs and followed up with an intensive outpatient program (IOP) through Wabash Valley Alliance (WVA). After completing the IOP, Mother went through sixteen weeks of relapse prevention. She did not, however, follow through with the recommended social support group through WVA, but rather chose to attend narcotics anonymous (NA).

[9] Additionally, during this six-month timeframe, Mother participated in and was receptive to some of the services offered by DCS, actively and appropriately interacted with Child during visits, obtained full-time employment and an apartment, and her drug-screens were clean. Mother also engaged in case management services. Individuals assigned to work with Mother and Child, including the Family Case Manager (FCM) and Court Appointed Special Advocate (CASA), described Mother as making "tremendous progress" and noted that the goal was reunification of Mother and Child. *Transcript* at 6. In fact, near the end of this six-month period, service providers were considering arranging an in-home visit between Mother and Child.

[10] The in-home visit, however, never occurred because beginning in March 2015 (the third six-month period), Mother's participation in services started to decline. First, Mother failed to show for a therapy session. Shortly thereafter, on March 21, 2015, Mother was called for a drug screen, but was unable to produce a specimen. Over the course of the next few months, Mother failed to report for six additional drug screens, giving various reasons or wholly failing to communicate. In May, Mother had two positive drug screens and admitted to service providers that she had a relapse and had used spice. The FCM, CASA, and others talked with Mother about how to get back on track and referred her back to WVA for relapse prevention. Mother did not follow through with services at WVA, but rather claimed that she was attending NA meetings several times a month as her relapse prevention. Mother could not, however, produce any documentation to support her claim that she was attending NA meetings.

[11] Mother also failed to attend a scheduled appointment for case management services on February 20 and again on March 30, 2015. Mother was then placed under a no tolerance policy, but nevertheless missed a scheduled appointment in May 2015. In May, the case management service provider reported that although Mother had made progress initially, the case had "taken a significant downturn." *Exhibit 4* at 70. The service provider noted that Mother had "demonstrated that she is unable to save and budget her money despite continued pressure and persistence" and that she "does not have the time to manage the daily responsibilities of being a full time parent." *Exhibit 4* at 70.

Mother was eventually terminated from case management services for failure to participate.

[12] With regard to Mother's housing situation, the case management service provider noted that Mother's "stability and ability to even keep her home is in question from month to month." *Id.* Initially, Mother received government assistance. When it was discovered that Mother had falsified on her housing application that Child was in her care and that Mother had failed to inform the apartment complex that she had obtained employment, Mother's rent payment increased. Although Mother had been living in the same apartment since September 2014, she received an eviction notice in May 2015 based on her failure to pay rent for April and May. With help from family members, Mother was able to pay the back rent and avoid eviction, but she "fell short with other bills" and had her electricity shut off for six days. *Transcript* at 218.

[13] At the time of the termination hearing, Mother remained employed. Mother, however, had lost her driver's license for failing to pay "a judgment on an accident without insurance", but nevertheless continued to drive without a license. *Id.* at 227.

[14] Mother's visitation with Child similarly declined. In April, Mother was late cancelling a visit with Child, arrived at another visit without diapers, and ended another visit forty-five minutes early. On May 5, 2015, Mother failed to show for her scheduled visit with child. Two days later, Mother failed to confirm her visit with Child and was therefore considered a "no show". During a visit in

September 2015, at which Mother and paternal grandparents were present, Mother became angry and started screaming at a supervisor. Mother was asked to leave and informed that the police would be called. As Mother left, she continued screaming and making a scene. The police arrived and escorted everyone out of the facility. Mother's visitation was thereafter suspended due to inappropriate behavior in the presence of Child.

[15] In June 2015, after Mother's participation in services started to decline, DCS requested that the permanency plan be changed to concurrent plans of reunification of Mother and Child and initiation of TPR proceedings. Eventually, on August 5, 2015, the permanency plan for Child was changed when DCS filed a verified TPR petition. The court held a TPR hearing on October 26, 2015, at which service providers and Mother testified. On February 8, 2016, the court entered its order, along with findings of fact and conclusions of law, granting the TPR petition. Mother now appeals. Additional facts will be provided where necessary.

## Discussion & Decision

[16] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous.

*In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[17] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[18] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[19] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child, I.C. § 31-35-2-4(b)(2)(C), and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(D).

[20] Here, the trial court concluded that DCS established that I.C. § 31-35-2-4(b)(2)(B)(i) and (ii) had been satisfied. Mother challenges both conclusions. Because I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, we need only conclude that the trial court properly determined one of the conditions therein had been met. *See In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). With respect to (i), the court noted: "Neither parent has demonstrated the ability or

willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain sobriety and stability in order to care and provide adequately for [Child]." *Appellant's Appendix* at 15.

[21] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[22] In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child*

*Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[23] We first address Mother's challenges to several of the court's findings. Mother challenges Finding 22 wherein the court noted that "[n]either parent has followed recommendations for ongoing substance abuse support groups." *Appellant's Appendix* at 14. Mother asserts that this finding is erroneous and directs us to evidence that she completed a rehabilitation program and followed through with an IOP. Mother also points to her testimony that she attended weekly NA meetings since April 2015. Mother's testimony, however, is contrary to other evidence in the record. Indeed, Mother produced no evidence to support her claim that she regularly attended NA meetings and she even acknowledges that she did not have perfect attendance. DCS also presented evidence that relapse prevention through NA meetings was not the same as relapse prevention services offered by WVA, in which Mother chose not to participate after completion of her IOP program. These are the same services for which DCS made its most recent referral after Mother relapsed, but Mother did not follow through.

[24] All of the evidence Mother points to that tends to show that she sought treatment for her addiction and followed through with relapse prevention

services occurred during the second six-month period when Mother made great strides and cooperated with service providers. Mother ignores her conduct in the six months immediately prior to the termination hearing, which indicates Mother's return to a point where she is unable to care for Child. Mother also ignores the fact that she presented no evidence to corroborate her testimony that she was regularly attending NA. In sum, Mother's challenge to Finding 22 is simply an improper request that we reweigh the evidence. We conclude that Finding 22 is supported by the evidence.

[25] Mother also challenges Finding 23 wherein the court noted that "[d]espite lengthy services and periods of progress, Mother has failed to demonstrate sustained stability. Mother was evicted on April 1, 2015." *Id*. While there is conflicting evidence regarding the circumstances surrounding Mother's possible eviction at one point in time, the evidence in the record amply supports the trial court's finding that Mother has not demonstrated stability. Mother completed several assessments at the start of the CHINS proceedings, but admits that her participation in other services was sporadic for the first six months. Mother followed up this initial six-month period with six months of participation in services. Indeed, Mother finally completed her third attempt at substance abuse treatment, began visitations with Child, secured a job, obtained housing, and participated in other case management services.

[26] In the six months immediately preceding the termination hearing, however, Mother's participation started to decline. Although Mother participated in services to some degree, she ignores the fact that she missed at least six drug

screens, had a relapse by using spice, stopped cooperating with case management service providers such that services were terminated, and did not fully participate in visitation with Child. As above, Mother's challenge boils down to a request that we reweigh the evidence. Having reviewed the record, we conclude that the evidence in the record supports the court's finding that Mother "failed to demonstrate sustained stability." *Id.*

[27] Mother next challenges part of Finding 24 wherein the court noted that "Mother stopped engaging in services in late July/early August of 2015." *Id.* Mother acknowledges that she stopped participating in services, but claims that she did so only because the court ordered that DCS no longer fund any services for her. In making this argument, Mother ignores her conduct that led to this point. With the filing of the petition to terminate Mother's parental rights, many services to Mother were suspended. The decision to move forward with termination was made only after Mother's lack of participation in services and cooperation with DCS declined to a point where all previous progress was nearly lost and there was no indication that the circumstances were going to change. We conclude that Finding 24 is supported by the evidence in the record.

[28] Mother's challenges to these findings serve as the basis for her challenge to the court's conclusion that the there is a reasonable probability the conditions that resulted in Child's removal and continued placement outside the home will not be remedied. The court acknowledged that Mother had made significant progress at one point during the CHINS proceedings. Indeed, the FCM and the

CASA noted that during the second six-month segment, Mother had made "tremendous progress" and that the permanency plan was reunification of Mother and Child. *Transcript* at 6. At some point, the circumstances changed and Mother's participation and cooperation with service providers went downhill. The same service providers who supported Mother and worked with her to the point of considering an in-home visit are the same service providers who testified that the circumstances that resulted in the removal of Child from Mother's care have not changed and are unlikely to change given Mother's conduct in the six months immediately preceding the termination hearing. The general concern was Mother's lack of stability. Having reviewed the record, we cannot say the court's finding in this regard is clearly erroneous.

[29] Mother also challenges the court's conclusion that termination is in the best interests of Child. There is no doubt that Mother loves Child and such was acknowledged by the court and service providers. Despite this, the same service providers, who had worked with and fought for Mother's right to parent Child, testified that termination of Mother's parental rights is in Child's best interests. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests"). The record reflects that Mother made significant progress at one point in time, but any progress has since been lost. Child has now been in foster care for eighteen months and needs

permanency. Mother's conduct in the six months prior to the termination hearing is more telling of what the future holds than her conduct during a brief six-month period. *In re E.M.*, 4 N.E.3d at 643. We cannot say that the court erred in concluding that termination was in the best interests of Child.

[30] Finally, Mother challenges the court's conclusion that DCS established it had a satisfactory plan for the care and treatment of Child. DCS informed the court that the permanency plan for Child was adoption by the foster parents, to whom Child was closely bonded. Mother argues that DCS should have considered a guardianship with Child's paternal grandparents and asserts that such placement is an alternative to termination of her parental rights. The record reveals that the paternal grandparents have been involved throughout parts of the CHINS proceedings, even filing a motion to intervene and participating in visits with Child. Further, during the pendency of the CHINS proceedings, Father asked the court to consider placement of Child with the paternal grandparents rather than a foster home.[3]

[31] As Mother acknowledges, DCS is required only to detail a general direction of its plan. *See In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Here, DCS did just that. DCS noted that Child is bonded with the foster family she has been with for most of her young life and that Child needs permanency. We

---

[3] Although no details are provided, the record indicates that the paternal grandparents were considered for placement of Child, but were found unsuitable.

cannot say that the court's conclusion that there is a satisfactory plan in place for Child is clearly erroneous.

[32] Based on the foregoing, we conclude that the court's findings of fact are supported by the evidence in the record and the court's conclusions supporting termination of Mother's parental rights are not clearly erroneous.

[33] Judgment affirmed.

[34] Bradford, J. and Pyle, J., concur.